## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| TERNAEA L. WHEELER, | * | |
| Plaintiff, | * | |
| v. | * | Case No. 1:25-cv-03558-JKB |
| ANNE ARUNDEL COUNTY, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Plaintiff, Ternaea L. Wheeler, files this Opposition to Defendants' Motion to Dismiss and respectfully requests that the Court deny the Motion in its entirety.

I.      LEGAL STANDARD............................................................................................... 3

II.     ADMINISTRATIVE EXHAUSTION.................................................................... 5

III.    PLAINTIFF HAS ADEQUATELY PLED HER SECTION 1983 CLAIMS ...................... 10

IV.     MARYLAND LAW CLAIMS ARE INDEPENDENTLY TIMELY ............................. 17

V.      PLAINTIFF HAS ADEQUATELY PLED TITLE VII DISCRIMINATION AND RETALIATION ............................................................................................... 18

VI.     UNEMPLOYMENT FINDINGS IN PLAINTIFF'S FAVOR SUPPORT PLAUSIBLE INFERENCES OF PRETEXT............................................................................ 23

VII.    INDIVIDUAL DEFENDANTS KLEIN AND INGLE................................................ 23

VIII.   JOHN DOES.................................................................................................. 24

IX.     WRONGFUL DISCHARGE CLAIM ................................................................... 26

X.      FAILURE TO GRIEVE IS NOT FATAL TO FEDERAL CLAIMS................................ 27

XI.     IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND .................... 28

XII.    CONCLUSION............................................................................................... 29

Ternaea Wheeler served Anne Arundel County's detention facilities for sixteen years before her termination on June 11, 2024. She first filed an EEOC charge on August 2, 2023 alleging race discrimination and retaliation (her "Initial Charge"). Eleven months later, she received her Notice of Right to Sue on the Initial Charge — and the same day that her matter was closed with the EEOC, Superintendent Klein signed her termination notice. She then filed a subsequent EEOC Charge (the "Second Charge") on August 26, 2024, alleging discrimination based on sex and retaliation. She was then issued a Notice of Right to Sue on the Second Charge on August 7, 2025.

In the preceding months, Klein refused EEOC mediation (Compl. ¶ 73), escalated her discipline beyond union recommendations to impose an unprecedented three-year Last Chance Agreement (Compl. ¶ 119), and presided over an investigation in which Plaintiff was subjected to sixteen questions while the white male comparator who had directed profanity at her was asked three (Compl. ¶¶ 116-117). A neutral unemployment hearing examiner with the Maryland Department of Labor found that her termination was not for misconduct, qualifying her for unemployment benefits (Compl. ¶¶ 92-95, 155). Corporal Fontz, the union Vice President, reviewed the termination video and found no wrongdoing (Compl. ¶ 127). Plaintiff alleges that nurses whose complaints formed the basis for termination were subsequently terminated for misconduct. (Compl. ¶¶ 129-130.)

Defendants now ask this Court to dismiss every one of Plaintiff's claims before a single document is produced in discovery. To do so, they import wholesale the evidentiary standards of Rule 56 summary judgment motion into a Rule 12(b)(6) motion — arguing about the strength of Plaintiff's evidence, the sufficiency of her comparators, and her ability to ultimately prove her case.

These are fact-intensive questions that are not appropriate at this stage of litigation. The motion should be denied.

### I.    LEGAL STANDARD

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Barbour v. Garland*, 105 F.4th 579, 589 (4th Cir. 2024). The question is whether the complaint contains sufficient factual matter to state a claim plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "So long as a complaint contains factual allegations that raise a right to relief above the speculative level, thereby nudging the claims across the line from conceivable to plausible, dismissal is improper." *Barbour*, 105 F.4th at 589(quoting *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022)). Plaintiff need not establish her case; she need only allege facts that, if proven, would support relief. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Defendants compound their legal error by importing Rule 56 standards into a 12(b)(6) motion, devoting pages to the *McDonnell Douglas* burden-shifting framework, what evidence establishes pretext, and whether Plaintiff's comparators are "actually" similarly situated. These are fact-intensive questions that have no place here, prior to discovery.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) addressed "the order and allocation of proof in a private, non-class action challenging employment discrimination" *at summary judgment*. *Id.* at 800. The framework it established is three-part and sequential: first, the plaintiff bears the burden of establishing a prima facie case by showing membership in a protected class, qualification for the position, an adverse employment action, and circumstances supporting

an inference of discrimination; second, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action; and third, the burden returns to the plaintiff to demonstrate that the proffered reason is pretext. *Id.* at 802-05; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). This is a framework for organizing evidence at summary judgment and trial. It is not a pleading standard.

The Supreme Court made this explicit in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002): "The prima facie case under *McDonnell Douglas* is an evidentiary standard, not a pleading requirement." *Id.* at 510. The Court noted that *McDonnell Douglas* itself made clear that the "critical issue" concerned was "the order and allocation of *proof*" — not the sufficiency of a complaint. *Id.* (emphasis added). Requiring a plaintiff to plead a prima facie case at the motion to dismiss stage is directly contrary to the Federal Rules, because "the *McDonnell Douglas* framework does not apply in every employment discrimination case" and "the precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Id.* at 512 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). It is "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits." *Id.*

Moreover, applying *McDonnell Douglas* at the pleading stage contradicts the structure of Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz*, 534 U.S. at 513(quoting Fed. Rule Civ. Proc. 8(a)(2)). When the Court in *Twombly* described the *McDonnell Douglas* framework as a device designed for "cases without direct evidence," it was equally describing an evidentiary structure built for summary judgment — not a gate through which a complaint must pass. *Twombly*, 550 U.S. at 569-70.

4

Defendants' treatment of comparators is governed by the same principle.    Whether Plaintiff's comparators are "similarly situated" within the meaning of *McDonnell Douglas* is a factual determination that depends on evidence produced in discovery.    The Fourth Circuit has held that a white comparator, while highly probative, is not even a required element of the prima facie case.  *Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536, 546 (4th Cir. 2003)("However helpful a showing of a white comparator may be to proving a discrimination claim, it is not a necessary element of such a claim."). The question is whether Plaintiff has alleged facts that support a plausible inference of discriminatory treatment.  As a matter of law, she has.

Defendants' motion asks this Court to do what Rule 12(b)(6) does not permit: resolve factual disputes, weigh the sufficiency of evidence, and determine whether Plaintiff can win.  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  The question before this Court is whether her allegations, accepted as true, state plausible claims for relief -- which under *Iqbal*/*Twombly* they do.

## II.    ADMINISTRATIVE EXHAUSTION

### A. The Operative Right-to-Sue Letter Is the August 7, 2025 Reissued Letter

The 90-day filing requirement is a statute of limitations subject to equitable tolling, not a jurisdictional bar. *Zipes v. Trans World Airlines*, 455 U.S. 385, 393 (1982). The Fourth Circuit applies equitable tolling "when, due to agency error or misinformation, a complainant fails to meet the time requirements for filing a civil action once a right-to-sue letter has been issued." *Bishop v. Hazel & Thomas, PC*, 151 F.3d 1028 (4th Cir. 1998). Courts in this district weigh pro se status favorably in equitable tolling analysis. *Jacobs v. Walmart*, No. RDB-22-2666 (D. Md. 2022).

Plaintiff proceeded entirely pro se throughout her EEOC proceedings. After receiving the June 11, 2024 right-to-sue letter on her Initial Charge, she contacted EEOC Supervisor Rosemarie Rhodes expressing concerns about the investigation (Compl. ¶¶ 9-10, 87-88). Just 76 days later — well within the 90-day window to file suit on her Initial Charge — Plaintiff filed what she understood to be a continuation of her first charge (Compl. ¶¶ 89). The EEOC accepted this filing, opened a new investigation, and issued a second right-to-sue letter on August 7, 2025 (Compl. ¶¶ 89-90).

The timing itself proves Plaintiff's reasonable belief that her administrative process remained open. Rather than filing suit, she pursued what she believed was further EEOC review. Had the agency informed her adequately that the second filing would not extend the first charge's deadline, she had ample time to file suit before the 90-day window closed. The EEOC's acceptance of her filing without such clarification induced her reasonable reliance. A pro se complainant who contacts an EEOC supervisor about an inadequate investigation, files additional paperwork within 76 days, and sees that paperwork assigned a new charge number and investigated for over a year could reasonably believe the administrative process remained open and her right to sue would be measured from its conclusion.

This is precisely the agency-induced confusion equitable tolling addresses. Plaintiff filed this lawsuit within ninety days of the August 7, 2025 right-to-sue letter. Whether the Court treats that as the operative letter or views the earlier deadline as equitably tolled, her claims are timely.

"Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541, 551 (2019). The exhaustion requirement exists to put the employer on notice of the alleged discrimination and to provide the EEOC with an opportunity to investigate

and conciliate the claim. *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593–94 (4th Cir. 2012); *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005); *EEOC v. Shell Oil Co.*, 466 U.S. 54, 77 (1984); *Love v. Pullman Co.*, 404 U.S. 522, 526 (1972). Here, these purposes were served. The EEOC investigated both charges from August 2023 through August 2025. The County had notice at every stage. The conciliation window remained available throughout. Whether viewed as two related charges or a continuation of a single administrative matter, functional exhaustion was satisfied.

### B. The Second Charge Encompasses the Full Course of Retaliatory Conduct

Plaintiff's second EEOC charge, filed August 26, 2024, alleged gender discrimination and retaliation concerning the Last Chance Agreement and termination (Compl. ¶ 89). Because EEOC charges are construed liberally, a plaintiff may pursue claims that are reasonably related to the administrative charge and can be expected to follow from a reasonable administrative investigation. *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 594 (4th Cir. 2012). The second charge specifically identified retaliation for filing the first charge and encompassed the escalating discipline culminating in termination.

The Fourth Circuit has long recognized that a plaintiff alleging retaliation for filing an EEOC charge need not file a separate, independent charge for that retaliation. In *Nealon v. Stone*, 958 F.2d 584 (4th Cir. 1992), the court established that a retaliation claim growing out of a prior EEOC charge is "like or reasonably related to" the underlying charge and may be raised in federal court without an additional administrative filing. The Fourth Circuit reaffirmed this principle in *Jones v. Calvert Group, Ltd.*, 551 F.3d 297 (4th Cir. 2009), explaining that where a second charge expressly alleges a pattern of continuing retaliatory conduct, a termination that follows is not a

separate, unexhausted act — it is "merely the predictable culmination of [the employer's] alleged retaliatory conduct." *Id.* at 304.

That is precisely the situation here.  Plaintiff's second charge identified the original charge as the protected activity that triggered the retaliation, described a pattern of escalating adverse treatment, and alleged continuing differential treatment in retaliation for filing the first charge. Under *Jones*, the termination was the foreseeable endpoint of the retaliatory conduct already described to the EEOC.  Defendants had notice of the race-related claims via the Initial Charge. The EEOC had notice. The purposes of the exhaustion requirement were each fully served.  See *Fort Bend County v. Davis*, 587 U.S. 519, 545 (2019).

The sequence is straightforward: Klein refused EEOC mediation in January 2024; imposed the LCA beyond union recommendations in March 2024; and terminated Plaintiff on June 11, 2024 (Compl. ¶ 72, 86).  These are not discrete or unrelated acts.  They are a continuum of retaliatory responses to Plaintiff's August 2, 2023 EEOC filing, each falling within the scope of the second charge and each within the applicable limitations period.

### C.  Race Discrimination Claims Survive Through the Continuing Violation Doctrine and Are Timely Actionable Acts

Plaintiff alleges specific actionable events within the limitations period: the Last Chance Agreement issued March 1, 2024 and the termination on June 11, 2024.  Both are adverse employment actions.  Both are alleged to be racially discriminatory.  Both are independently actionable.

The events are timely.  Under *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), discrete discriminatory acts are independently actionable, and "each discrete act starts a

new clock for filing charges alleging that act." *Id.* at 113. Critically, *Morgan* makes clear that related prior acts do not foreclose claims on timely-filed discrete acts: "the existence of past acts and the employee's prior knowledge of their occurrence does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." *Id.* Both the LCA and the termination occurred within the limitations period. Both are classic discrete acts -- formal employment decisions with immediate legal effect, each with a specific date of occurrence. Both were timely charged.

Both constitute adverse employment actions. The Supreme Court's recent unanimous decision in *Muldrow v. City of St. Louis*, 601 U.S. 346, 144 S. Ct. 967 (2024), lowered the threshold for what constitutes an adverse employment action under Title VII's anti-discrimination provision. An employee need only show "some harm with respect to an identifiable term or condition of employment" — the harm "need not be significant." *Id.* at 974. A termination is an adverse action without question. A Last Chance Agreement far surpasses the "mere" harm bar, as an LCA conditions continued employment on punitive terms, strips procedural protections, and carries the immediate consequence of termination upon any further violation. Under any standard — heightened or the *Muldrow* "some harm" floor — an LCA qualifies as an adverse employment action. *See also Morgan*, 536 U.S. at 114.

Both are alleged to be racially discriminatory. Plaintiff has alleged that similarly situated employees outside her protected class (non-African Americans) were not subjected to the same disciplinary process, were not issued an LCA under comparable circumstances, and were not terminated while she was. At the pleading stage, these allegations are accepted as true and support a plausible inference of racial discrimination. See *Barbour*, 105 F.4th at 596; *Swierkiewicz*, 534 U.S. at 510.

9

Both are independently actionable.  This follows directly from *Morgan*: discrete discriminatory acts that are timely filed are each separately actionable, regardless of their relationship to one another or to prior conduct outside the limitations period. 536 U.S. at 113. Defendants cannot collapse the LCA and the termination into a single event for the purpose of limiting Plaintiff's claims.  Each stands on its own.

Moreover, Plaintiff's hostile work environment claim expressly benefits from the continuing violation doctrine.  Where a hostile environment is alleged to be pervasive and ongoing — spanning years of discriminatory targeting, racial slurs tolerated by supervisors, and escalating retaliation — the entire period is cognizable so long as at least one act occurs within the limitations period.  *Morgan*, 536 U.S. at 117; *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277-78 (4th Cir. 2015) (en banc).  The April 2024 medical unit investigation, the LCA, and the June 2024 termination satisfy that threshold.

## III.   PLAINTIFF HAS ADEQUATELY PLED HER SECTION 1983 CLAIMS

### A.  Due Process: Plaintiff Was Denied Constitutionally Required Pre-Termination Process

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), guarantees not the *formality* of a hearing but a meaningful opportunity to respond to the specific charges.  The constitutional minimum requires notice of the charges sufficient to permit a substantive defense — not a proceeding in which the critical evidence is withheld while a termination decision is announced. *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). See also *Garraghty v. Jordan*, 830 F.2d 1295, 1300 (4th Cir. 1987).

Plaintiff alleges she was never provided the nurse complaints that formed the basis for her termination  (Compl. ¶ 77).  She requested access to witness statements and surveillance footage — both denied  (Compl. ¶¶ 80-81).  Corporal Fontz, the union Vice President, independently reviewed available footage and found no wrongdoing  (Compl. ¶ 81).  The unemployment hearing examiner found that her requests to speak with witnesses, read their statements, and obtain surveillance footage were all denied (Compl. ¶¶ 80-81).  *See also* Defendant's Ex. 8. Accepting these allegations as true, Plaintiff was denied the constitutionally required opportunity to meaningfully respond.  A pre-discharge hearing conducted without access to the underlying evidence is not Loudermill compliance — it is Loudermill compliance in name only.

The differential treatment in the investigative process is independently significant. Plaintiff received a sixteen-question investigatory interview.  Corporal Purdy — the white male officer who had directed profanity at Plaintiff — was asked three questions (Compl. ¶¶ 116-117). This disparity demonstrates that the investigation was structured to build a case against Plaintiff, not to find facts.  Whether the process provided adequate constitutional protection is not a question this Court resolves on a motion to dismiss; it is a question of fact.

### B. Equal Protection: Specific Comparators Support a Plausible Inference of Discriminatory Treatment

Plaintiff alleges that white and male officers who committed equal or more serious violations received materially lesser discipline.  At the pleading stage, she need only allege facts that, if proven, support a discrimination claim.  *Coleman*, 626 F.3d at 190.  *Coleman* requires merely sufficient factual detail to make a *plausible inference* that they are comparators. *Id.* at 191-92. Whether these officers are "actually" similarly situated is a question of fact for discovery, not a basis for dismissal. *Barbour*, 105 F.4th at 596-97.

11

The comparators alleged are not vague — they are named, dated, and specific. The comparators listed expressly discusses other Detention Officers (Plaintiff's title/role), though the Complaint does include employees with other titles where the factual circumstances further support an inference of race- and sex- based disparate treatment. For example:

- Officer Miller (white female), a Kitchen Supervisor, left the kitchen office door unlocked while making a food delivery. An inmate entered, took a knife, and held staff member Ms. Gomez hostage at knifepoint. Despite this serious security breach, Miller received no disciplinary action. (Compl. ¶ 41.)

- Officers Christopher Chick and Lisa Weber (both white) were involved in workplace domestic violence and serial policy violations, including a workplace romantic relationship in violation of policy. When their relationship ended and Weber began dating Sergeant Zigler, an altercation ensued leading to arrest. Captain Ingle personally intervened to have their records expunged. They received no discipline. (Compl. ¶ 20.)

- Officer Atekoj (Black male) assaulted an inmate who refused to end a phone call, punching him in the face multiple times on video. He failed to report the assault and denied wrongdoing. Despite this, he received only a one-day suspension and was promoted one year later. (Compl. ¶ 40.)

- Officer Alvarez Holman (Black male) was on a "last chance agreement" and repeatedly committed infractions including chronic tardiness and no-call/no-shows. When his termination was due, Superintendent Klein gave him 16 days off split across pay periods rather than termination. (Compl. ¶ 44.)

- Officer Curtis Sims (Black male) was placed under investigation after a physical altercation with an inmate that required hospitalization. He received no disciplinary action. (Compl. ¶ 46.)

- Officer Jorge Pizarro (Hispanic male) used his facility key to stab Inmate Rodell during a dispute. He was barred from the facility for 4-5 weeks and received only a three-day unpaid suspension. He was allowed to take the corporal exam and interview for promotion despite policy prohibiting employees with incidents within the past 12 months from testing for advancement. (Compl. ¶ 47.)

- Officer Eduardo Pizarro (Hispanic male) punched an inmate who had taken a meal tray and struck the same inmate again after a bail review, despite the inmate's hands being cuffed behind his back—a violation of Maryland law. The assault occurred in front of a supervisor. No meaningful action was taken. (Compl. ¶ 48.)

- Officer Bailey was allowed to work in the building while facing potential termination for allowing an inmate to escape, whereas Plaintiff was barred from entering the building for eight weeks based on uncorroborated nurse allegations. (Compl. ¶¶ 49, 110, 123.)

- Corporal Norman Smith (white male) failed to secure his service weapon—a criminal safety violation. He received only three days suspension and was advised by ACFA Ingle not to appeal. He was allowed to test for promotion to Sergeant shortly thereafter. (Compl. ¶ 42.)

- Corporal Purdy directed profanity at Wheeler, stating "Can you stop getting so fucking loud?" during standard procedures. While Wheeler received formal counseling, Purdy's conduct was resolved informally through "conflict resolution." When Wheeler was

subjected to a 16-question investigatory interview for similar conduct, Purdy was asked only three questions and offered mediation. (Compl. ¶¶ 60-61, 71.)

- Sergeant Charles Lloyd (white male) made multiple corroborated racist remarks against Officer Cameron Davis, a Black officer, throughout the 2023 academy class. This warranted a 45-day suspension. He received no formal discipline and was merely barred from teaching future academy classes. (Compl. ¶ 45.)

- Sergeant Jason Blackburn (white male) routinely tore up inmate commissary requests, retaliated against inmates, contacted inmates to discuss Wheeler negatively, and blocked Wheeler's raises through negative performance reviews despite her fulfilling job duties. He received no discipline. (Compl. ¶¶ 27-30.)

- CPS II Tina Sanders (white female) engaged in a sexual relationship with an inmate—a crime. Rather than face termination, ACFA Ingle served as Hearing Officer and, showing compassion, allowed her to exhaust leave time through retirement with full pension. She retired November 1, 2024. (Compl. ¶ 43.)

Defendants argue these comparators involve "radically different" misconduct. The Fourth Circuit has cautioned against applying an overly restrictive comparator standard, explaining that employees need only have engaged in similar — not identical — conduct of comparable seriousness. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019). Comparator analysis "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993).

14

To the extent the comparators' conduct *is* different, it further reinforces Plaintiff's claims of disparate treatment. White officers who committed criminal acts received suspensions of three days or less, or no discipline at all. Plaintiff received termination for using profanity in a phone call — conduct her coworker described as minor and for which she immediately apologized. When an employer terminates a Black employee for minor workplace misconduct while allowing white employees to retain their positions after weapons violations, sexual relationships with inmates, and physical assaults on restrained detainees, a reasonable jury does not struggle with the inference.

The severity inversion is itself evidence of pretext. The Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), made clear that the trier of fact may "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," and that "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Id.* Proof that the employer's explanation is unworthy of credence "is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* at 147.

Comparator evidence is especially probative of pretext. The Fourth Circuit has confirmed that comparator evidence is "especially relevant" to a showing of pretext. *Laing v. Federal Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (quoting *McDonnell Douglas*, 411 U.S. at 804). "Proof that the defendant's explanation is unworthy of credence is…probative of intentional discrimination." *Reeves*, 530 U.S. 133, 147–48 (2000). Shifting post-hoc explanations are similarly probative. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001). Defendants' characterization of these comparators as "radically different" is a post-hoc construct. Discovery will show this.

The comparators do not defeat Plaintiff's claim. They strengthen it. The question of whether these comparators are "similarly situated" in the fullest sense is a factual determination that belongs to the jury, not to Defendants on a 12(b)(6) motion to dismiss. *Swierkiewicz*, 534 U.S. at 511-12. Whether specific comparators are "similarly situated" in all relevant respects depends on evidence developed in discovery — the supervisory chain, the applicable disciplinary standards, the full disciplinary histories, and the decision-makers involved. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Defendants may renew their comparator arguments at the summary judgment stage, on a developed record. They cannot use this motion to litigate evidentiary questions that belong to a later proceeding.

### C. Monell Liability: Klein Was a Final Policymaker Who Personally Made the Challenged Decisions

Superintendent Klein possessed final policymaking authority over AADF disciplinary decisions. His personal decisions — escalating Plaintiff's discipline beyond union recommendations, refusing her request to discuss the pattern of targeting, extending leniency to Officer Holman while rigidly enforcing the LCA's termination provision against Plaintiff, and making the final termination decision — constitute the official policy of Anne Arundel County.

Where a final policymaker personally makes the challenged decision, no separate showing of custom or practice is required. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Mikels v. City of Durham*, 183 F.3d 323, 335 (4th Cir. 1999). The pattern of Klein extending leniency to similarly situated officers while escalating discipline against Plaintiff is, at minimum, a sufficient factual allegation to survive a motion to dismiss.

## IV.   MARYLAND LAW CLAIMS ARE INDEPENDENTLY TIMELY

Plaintiff's Maryland Fair Employment Practices Act claims are governed by a separate and more generous statute of limitations than Title VII. Under Maryland Code, State Government § 20-1013(a)(1), a complainant may bring a civil action if she: (i) initially filed a timely administrative charge under federal, State, or local law; (ii) at least 180 days have elapsed since filing; and (iii) the civil action is filed within two years after the alleged unlawful employment practice occurred, or three years for harassment claims.

Critically, Maryland law provides that "[t]he time limitations under paragraph (1)(iii) of this subsection shall be tolled while an administrative charge or complaint filed by the complainant under paragraph (1)(ii) is pending." Md. Code, State Gov't § 20-1013(a)(2). This tolling provision extends the limitations period by the duration of the administrative investigation.

Plaintiff filed her First Charge on August 2, 2023, and received her right-to-sue letter on June 11, 2024 — an investigation period of approximately 10 months. She then filed her Second Charge on August 26, 2024, and received her right-to-sue letter on August 7, 2025 — an investigation period of approximately 11.5 months. This lawsuit was filed on October 29, 2025. Together, these two administrative proceedings toll the Maryland statute of limitations for approximately 21.5 months. For discrimination claims (2-year SOL + 21.5 months tolling), the Plaintiff may pursue claims arising from conduct as far back as January 2022. For harassment or hostile work environment claims (3-year SOL + 21.5 months tolling), the Plaintiff may pursue claims arising from conduct as far back as January 2021.

17

The Last Chance Agreement (March 1, 2024), the April 2024 investigation, and the June 11, 2024 termination all fall well within these timeframes. So too does the substantial pattern of discriminatory treatment alleged from 2022 through 2024, including the July 2022 food quality incident, the December 2022 drug distribution reports that were ignored, the February and April 2023 investigations, and the December 2023 phone call incident. Maryland's independent cause of action and broader limitations period ensure that Plaintiff's state law claims survive regardless of any federal exhaustion or timeliness issues.

V.    **PLAINTIFF HAS ADEQUATELY PLED TITLE VII DISCRIMINATION AND RETALIATION**

A.  **Plaintiff Has Alleged a Prima Facie Case**

Plaintiff alleges: (1) she is an African American woman; (2) she performed her duties satisfactorily across fifteen years of service, maintaining a 95% attendance record and accumulating nearly 1,200 hours of sick leave; (3) she suffered adverse employment actions (suspension, a Last Chance Agreement, and termination); and (4) white and male officers who committed equivalent or more serious violations were treated more leniently. These allegations satisfy the applicable pleading standard. *Coleman*, 626 F.3d at 190.

Defendants characterize Plaintiff's discipline history as an admission of unsatisfactory performance. This inverts the complaint. Plaintiff alleges that her discipline history is not evidence of poor performance — it *is* the discriminatory targeting. She was investigated on uncorroborated allegations while identical or stronger evidence she provided in her own defense was dismissed. She was subjected to write-ups that disqualified her from promotion while white officers with active misconduct were permitted to sit for advancement examinations. Plaintiff

18

alleges that her discipline history did not lead to her termination; it was the culmination of a longtime, escalating pattern of discriminatory treatment.

**B.  The Holman Comparator Demonstrates Inconsistent LCA Enforcement**

Defendants argue Plaintiff identifies no comparator subject to a Last Chance Agreement who was retained following subsequent infractions.  That representation is directly contradicted by the complaint.  Officer Alvarez Holman was on a last chance agreement.  He committed repeated infractions, including chronic tardiness and no-call/no-shows.  He was not terminated. Instead, Superintendent Klein personally intervened at another supervisor's request and authorized sixteen days off in lieu of termination, spread across multiple pay periods.  (Compl. ¶ 44.)

Klein — the same official who escalated Plaintiff's discipline to an LCA beyond union recommendations, refused mediation, and signed her termination — extended discretionary leniency to Holman for repeated violations of the same agreement.  Where the same official exercises discretion leniently toward one employee and rigidly toward another, the disparity is not incidental.  It is the central fact.  *Cook*, 988 F.2d at 511.

While Holman is the same race as the Plaintiff, Holman demonstrates that Klein enforced the use of LCAs inconsistently between male and female employees, and between employees who have and who have not filed EEOC charges. The Fourth Circuit has recognized that selective enforcement of workplace rules is probative of both discriminatory and retaliatory motive. *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001).  Where a plaintiff has filed an EEOC charge and an official who knew of that charge subsequently applies discipline with a rigidity he did not apply to similarly situated employees, that pattern supports a plausible

inference that the EEOC charge, not the conduct, was the operative variable. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

One supervisor. One type of agreement. Termination for one; sixteen days off for the other. Under *Reeves*, the trier of fact may reasonably infer from the disparity in treatment that the employer is dissembling to cover up a discriminatory purpose. *Reeves*, 530 U.S. at 147; *Sears Roebuck*, 243 F.3d at 852-53. That is all Plaintiff must show at this stage. *Swierkiewicz*, 534 U.S. at 512.

### C. The Timeline Establishes a Plausible Inference of Retaliation

A "plaintiff may demonstrate causation by temporal proximity, or by 'the existence of facts that suggest that the adverse action occurred because of the protected activity,' or by a combination of the two." *Barbour*, 105 F.4th at 593 (quoting *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021). The sequence of events in the complaint, accepted as true, compels a plausible inference of retaliation:

- August 2, 2023: First EEOC charge filed.

- August 3, 2023: The day after filing, coworkers openly discussed Plaintiff "bringing it on herself" (Compl. ¶¶ 65-66).

- December 2023: Phone call incident with Officer Allen. Allen described the conduct as minor during mediation. Sergeant Blanton expressed a desire to "get rid of" Plaintiff.

- January 2024: County refused to participate in EEOC mediation.

- March 1, 2024: Klein imposed an unprecedented three-year Last Chance Agreement, escalating beyond what the union recommended.

- April 8-9, 2024: Medical unit investigation.  Plaintiff was denied access to the underlying complaints, witness statements, and surveillance footage.  Union VP Fontz reviewed available footage and found no wrongdoing.  Plaintiff alleges that nurses who filed the complaints were subsequently terminated for misconduct.

- May 15, 2024: Plaintiff contacted the office of U.S. Senator Van Hollen due to EEOC's failure to respond (Compl. ¶ 76).

- June 11, 2024: First right-to-sue letter issued, EEOC case closed (Compl. ¶ 85).

- June 11, 2024: Klein signed the termination notice (Compl. ¶¶ 85-86).

The right-to-sue letter preceding the termination *on the same day* is itself sufficient to support a plausible inference of causation at the pleading stage.  Paired with Blanton's "get rid of her" statement, staff openly discussing Plaintiff's EEOC charge the day after it was filed, and the County's refusal to engage in mediation, the temporal nexus is part of a pattern that far exceeds the minimum required to survive dismissal.

**D. The Last Chance Agreement Is Itself a Retaliatory Act and Cannot Be Used as a Shield**

Defendants argue the LCA forecloses relief because Plaintiff voluntarily accepted its terms.  This argument is circular.  It requires the Court to assume the conclusion — that the LCA was a legitimate disciplinary measure — in order to defeat the very claim that it was not.  Plaintiff alleges the LCA was a retaliatory and discriminatory act.  Defendants cannot use an allegedly retaliatory agreement to immunize themselves from liability for the retaliation the agreement represents.

The Supreme Court held in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006), that the anti-retaliation provision extends beyond termination to any action that would

21

dissuade a reasonable worker from making or supporting a charge of discrimination. A three-year Last Chance Agreement conditioning continued employment on perfect conduct — imposed seven months after the initial EEOC filing, beyond union recommendations, by the same official who would later terminate Plaintiff — falls squarely within *Burlington Northern*'s scope (Compl. ¶ 73). Whether Plaintiff's acceptance was truly voluntary, in the context of an alleged sustained campaign of discriminatory targeting, is a factual question for discovery.

Plaintiff also contests the validity of the underlying April 2024 investigation that triggered the LCA's termination provision. She was denied access to the nurse complaints, denied the opportunity to review surveillance footage, and denied the chance to confront her accusers (Compl. ¶¶ 77, 80, 99). Corporal Fontz reviewed the footage independently and found no wrongdoing (Compl. ¶ 81). Plaintiff alleges that nurses who filed the complaints were subsequently terminated for misconduct (Compl. ¶¶ 82-84). These are not pleading deficiencies. They are the contested facts that make this a case for a jury.

### E. Gender Discrimination Claims Are Independently Viable

Plaintiff's second EEOC charge specifically alleged gender discrimination, and the complaint identifies gender-based disparity throughout her employment. Male officers — Smith, Lloyd, Purdy — received materially lesser discipline for equal or more serious misconduct. The sixteen-question investigatory interview imposed on Plaintiff, compared to the three questions asked of Purdy, exemplifies differential process applied along gender lines. These allegations support independent gender discrimination claims under Title VII and are not subsumed by the race discrimination analysis. They stand on their own.

22

## VI.   UNEMPLOYMENT FINDINGS IN PLAINTIFF'S FAVOR SUPPORT PLAUSIBLE INFERENCES OF PRETEXT

The Complaint alleges the Maryland unemployment examiner's findings because a contemporaneous determination by a neutral arbiter creates a reasonable inference supporting Plaintiff's claims. The examiner found in Plaintiff's favor after adversarial proceedings, concluding that: (1) 27 prior disciplinary actions cited by the County — 23 occurring two or more years before termination — were too remote to establish a connection to discharge; (2) the County's evidence consisted almost entirely of hearsay without first-hand testimony except for the February 2024 incident; (3) an isolated use of profanity was insufficient to constitute terminable misconduct; and (4) had the County considered Plaintiff's behaviors so egregious for more than 13 years, it did not stand to reason that she was not discharged sooner (Compl. ¶¶ 91-95). *See also* Exhibit 8 to Defendant's Motion to Dismiss. When a neutral decision-maker evaluates the County's stated justification in contested proceedings and finds it lacking, that determination supports the inference that the termination was pretextual.

## VII.   INDIVIDUAL DEFENDANTS KLEIN AND INGLE

Defendants describe the allegations against Klein and Ingle as "almost non-existent."  The complaint tells a different story.

Superintendent Klein personally escalated Plaintiff's discipline to the LCA beyond union recommendations (Compl. ¶ 73); refused her July 2023 request to discuss the pattern of targeting she had documented (Compl. ¶ 63); declined to participate in EEOC mediation (Compl. ¶ 72); made the final termination decision on June 11, 2024 (Compl. ¶ 86); and personally intervened to extend leniency to Officer Holman while enforcing the LCA's termination provision against

Plaintiff (Compl. ¶ 44). Klein is not a peripheral figure in this litigation. He is at the center of every adverse action Plaintiff suffered.

Captain Ingle ordered the investigation of Plaintiff and dismissed exculpatory evidence as irrelevant (Compl. ¶ 104); personally intervened to have Officers Chick and Weber's domestic violence records expunged (Compl. ¶ 20); served as hearing officer in the Sanders matter and authorized retirement with full pension rather than termination for a white female officer who engaged in a sexual relationship with an inmate (Compl. ¶ 43); and participated in the proceedings leading to Plaintiff's termination. Whether Ingle's involvement rises to personal liability or supervisory liability is a question for discovery, not a basis for dismissal at the pleading stage. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

## VIII.   JOHN DOES

Defendants argue that because named staff appear in the complaint, they cannot simultaneously be the John Doe defendants. Plaintiff agrees, and that is precisely the point. The John Does are not the named individuals. They are unknown supervisors, investigators, and policymakers whose participation in the events alleged has not yet been identified — precisely the category of defendants that John Doe pleading exists to preserve. Their identities are subject to disclosure in discovery. Dismissal at this stage would permanently foreclose claims against responsible parties before Plaintiff has had any opportunity to identify them.

Where a plaintiff cannot identify the responsible actors prior to filing, the appropriate course is to permit the case to proceed so that discovery may reveal those identities. Where the identity of a defendant is genuinely unknown at the time of filing, dismissal of a *Doe* defendant is inappropriate if discovery could reasonably reveal the identity. *Schiff v. Kennedy*, 691 F.2d 196,

203 (4th Cir. 1982). See also *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (holding that "where the identity of alleged defendants will not be known prior to the filing of a complaint," the plaintiff "should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds"); *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (reversing dismissal of Doe defendant where plaintiff had stated a claim and discovery could uncover the defendant's identity).

Plaintiff's inability to identify these individuals by name reflects not a pleading defect but a practical reality that Rule 15 was designed to address.  The Fourth Circuit has embraced a liberal approach to relation back, holding that the inquiry under Rule 15(c) "focuses on the notice to the new party and the effect on the new party that the amendment will have."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 469-70 (4th Cir. 2007) (en banc); *see also Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 548 (2010).  Supervisors and policymakers who participated in a discriminatory scheme will typically be affiliated with the named institutional defendants, will share counsel, and will have notice of this litigation within the Rule 4(m) period well before any amendment is sought.

Dismissal of the John Does now would permanently eliminate claims against potentially liable parties at the only stage in litigation when Plaintiff structurally lacks the information needed to name them.  Rule 12(b)(6) tests whether a complaint states a claim upon which relief can be granted, not whether Plaintiff has yet identified every defendant by name.  *Swierkiewicz*, 534 U.S. at 512.  Granting dismissal on this ground would reward the named Defendants' control over the very information that would identify their colleagues.  Courts have specifically declined to permit that result. See *Schiff,* 691 F.2d at 203; *Gillespie*, 629 F.2d at 642; *Wakefield*, 177 F.3d at 1163. The John Does should remain in this action pending discovery.

25

IX.    **WRONGFUL DISCHARGE CLAIM**

Defendants are correct that Maryland's common law wrongful discharge tort is a supplemental remedy, available only where no adequate statutory remedy exists to vindicate the underlying public policy violation. *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 614-15, 561 A.2d 179, 185 (1989). The Fourth Circuit has applied the same principle. *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 341 (4th Cir. 2006).

Plaintiff does not contest this principle. She pleads Count VI as an alternative claim pursuant to Federal Rule of Civil Procedure 8(d)(2), which expressly permits a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically." The purpose of alternative pleading is precisely this: to preserve a claim that becomes viable only if a prior claim fails. Wrongful discharge under Maryland law is the common law backstop when the statutory scheme does not deliver an adequate remedy. To the extent Plaintiff's statutory claims succeed, the wrongful discharge count will yield. If, however, those claims are dismissed, the same underlying conduct supplies a basis for relief. The two do not conflict; they are structured to operate in sequence.

The District of Maryland has recognized precisely this contingent operation of the Adler tort. In *Kerrigan v. Magnum Entertainment, Inc.*, 804 F. Supp. 733, 736-37 (D. Md. 1992), the court denied a motion to dismiss a wrongful discharge claim, holding that the claim "survives" the 12(b)(6) motion where no adequate statutory remedy is available to the plaintiff. If the Court finds that the statutory remedies adequately cover Plaintiff's claims, the wrongful discharge count is superseded and need not be adjudicated. If the statutory claims are found lacking at any stage, the common law claim stands ready.

26

Defendants are also correct that the wrongful discharge tort is directed at the employer rather than individual supervisors in the ordinary case. Plaintiff does not contest the dismissal of Count VI as to individual defendants. The count should survive as to the County at this stage, in the alternative, pending resolution of the statutory claims.

## X.    FAILURE TO GRIEVE IS NOT FATAL TO FEDERAL CLAIMS

Defendants argue that Wheeler's failure to grieve her termination is fatal to her claims. It is not. Section 1983 claims do not require exhaustion of internal grievance procedures. This principle is blackletter law, settled by the Supreme Court in *Patsy v. Board of Regents of the State of Florida*, 457 U.S. 496, 516 (1982), which held categorically that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." The *Patsy* Court examined the legislative history of the Civil Rights Act of 1871 and concluded that Congress did not intend to require plaintiffs to navigate internal or administrative processes before accessing federal court to vindicate constitutional rights. *Id.* at 506-07. An internal grievance procedure is a creature of contract and county policy; it is not a jurisdictional prerequisite to a § 1983 action. *See Monroe v. Pape*, 365 U.S. 167, 183 (1961).

Title VII claims similarly do not require exhaustion of internal grievance processes. The applicable exhaustion requirement under Title VII is the filing of a charge with the EEOC — not the pursuit of an employer's internal appeal procedures. *See* 42 U.S.C. § 2000e-5(b); *Fort Bend County v. Davis*, 587 U.S. 519, 523 (2019) (Title VII's "charge-filing requirement" is a claim-processing rule requiring exhaustion before the EEOC, not a jurisdictional bar). Nothing in Title VII conditions the right to sue on participation in an employer's internal grievance mechanism. Plaintiff has satisfied the statutory exhaustion requirement.

27

Plaintiff was entitled to seek her remedies before the EEOC and this Court.  Her election to do so rather than pursue an internal appeal the County had already demonstrated it would not honor — by refusing EEOC mediation, by disregarding union recommendations, by structuring a termination hearing without providing the underlying evidence — is neither a waiver nor a concession.  It is the rational decision of a plaintiff who had exhausted faith in the internal process and turned, as the law permits, to federal remedies.  Courts have recognized that an employee need not "present [a] claim to any grievance or arbitration procedure established in the collective bargaining agreement" before pursuing statutory rights under Title VII.  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49-50 (1974). The Supreme Court in *Gardner-Denver* was emphatic: the legislative history of Title VII "manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes." *Id.* at 48.

## XI.    IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND

Should the Court determine that any count of the Complaint does not satisfy the applicable pleading standard, Plaintiff respectfully requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2).  Leave to amend "shall be freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The Fourth Circuit has held that this standard strongly favors allowing amendment, and that leave should be denied only upon a showing of futility, bad faith, or undue prejudice to the opposing party. *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). None of those circumstances is present here.

This matter is at the initial pleading stage.  No discovery has been conducted.  No scheduling order has been entered.  No trial date is set.  Defendants would suffer no cognizable

28

prejudice from amendment, and there is no basis to conclude that any deficiency identified by the Court could not be cured through more specific pleading.  Where a complaint is dismissed for failure to state a claim, the court should "freely give leave to amend" unless it is certain that amendment would be futile.  *Id.* at 427.  That certainty does not exist here. Plaintiff could add detail regarding the supervisory chain for the comparator officers to further establish they were similarly situated to Ms. Wheeler.

Plaintiff therefore requests that, in the event any count is dismissed, the Court do so without prejudice and with leave to amend within a reasonable time to be set by the Court, or alternatively, to brings State claims in the Maryland Courts.

## XII.    CONCLUSION

Defendants ask this Court to resolve factual disputes, weigh evidence, assess credibility, and determine whether Plaintiff can ultimately prove her case.  These are not appropriate inquiries on a Rule 12(b)(6) motion.  They are the work of discovery, summary judgment, and trial.

Plaintiff has pled a years-long pattern of discriminatory targeting; escalating retaliation following the filing of an EEOC charge; termination the day of receiving a right-to-sue letter; preferential treatment of white and male officers for objectively more serious misconduct; denial of the basic procedural protections to which Plaintiff was constitutionally entitled; inconsistent LCA enforcement by the same official who signed her termination; and independent corroboration of her narrative from an unemployment proceeding.

These are not the allegations of a disgruntled employee papering the record.  They are the allegations of a Plaintiff whose case belongs before a jury. The Defendant's Motion should be denied.

Dated: February 27, 2026                    Respectfully Submitted,


/s/ Katherine Patton

Katherine Patton, Esq.

Maryland Bar Attorney ID: 2112140039
Fed. Bar No. 30693
Quinn Patton, LC
838 Ritchie Highway, Suite 4
Severna Park, MD 21146
(443) 247-5444
katpatton@quinnpatton.com
www.quinnpatton.com

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of February, 2026, a copy of this Memorandum in Opposition to Defendants' Motion to Dismiss was served electronically via the Court's ECF system upon:

Genevieve G. Marshall, Esq.
Senior Assistant County Attorney
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
lwmars99@aacounty.org
Attorney for Defendants

Respectfully,

 /s/ Katherine Patton

Katherine Patton